**LEHIGH VALLEY HOSPITAL— MUHLENBERG, Appellant,**

v.

**Michael O. LEAVITT, Secretary of Health and Human Services.**

No. 06–4194.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Friday, Sept. 14, 2007.

Filed: Oct. 30, 2007.

---

Steven E. Hoffman, Tallman, Hudders & Sorrentino, Allentown, PA, for Lehigh Valley Hospital–Muhlenberg.

Annetta F. Givhan, Office of United States Attorney, Philadelphia, PA, for Michael Leavitt.

Before: RENDELL, FUENTES, and CHAGARES, Circuit Judges.

## OPINION OF THE COURT

CHAGARES, Circuit Judge.

Plaintiff-appellant Lehigh Valley Hospital—Muhlenberg (Lehigh) appeals the District Court's decision, denying plaintiff's motion for summary judgment, granting the motion for summary judgment in favor of Michael O. Leavitt, Secretary of Health and Human Services, and entering final judgment in favor of defendant-appellee in this action that concerns disputed claims for Medicare reimbursement. The District Court affirmed the determination of the Provider Reimbursement Review Board that plaintiff was not entitled to reimbursement for a loss on the sale of a health care facility because the transaction was not a *bona fide* sale. Because the District Court granted summary judgment, our review of that decision is plenary, and we review the Provider Reimbursement Review Board's decision for substantial evidence. We will affirm the District Court's decision.

### I.

Under the Medicare Act, the federal government reimburses health care providers for the reasonable costs of covered services provided to Medicare beneficiaries. 42 U.S.C. § 1395f(b)(1); 42 C.F.R. § 413.9. The regulations issued by the Department of Health and Human Services explain that reimbursable costs include depreciation in value of buildings and equipment used in providing care to patients. 42 C.F.R. § 413.134(a). Providers receive reimbursements yearly for a percentage of the annual depreciation equal to the percentage of the asset used for care of Medicare patients. *Id.* § 413.134(a). This amount is, however, only an estimate of the asset's declining value. *Id.* § 413.134(f)(1). As a result, when a Medicare provider sells a building or equipment, the provider may suffer a loss if the asset is sold for less than its net book value, the historical cost minus depreciation previously paid to the provider. *Id.* § 413.134(b)(9). If the transaction is a *bona fide* sale, the provider may seek reimbursement from Medicare for the loss. *Id.* § 413.134(f)(2)(i).

To obtain reimbursement, providers file annual cost reports with their fiscal intermediary. *Id.* § 413.20. The fiscal intermediary audits the report and informs the provider of the amount of reimbursement for that year. *Id.* § 405.1803. The provider can then appeal that determination to the Provider Reimbursement Review Board (the Board or PRRB), which issues a decision. 42 U.S.C. § 1395oo(a). The Centers for Medicare and Medicaid Services (CMS) administrator may choose to review the Board decision and issue its own. If CMS declines to review the decision, the Board's decision becomes the final decision of the Secretary of Health and Human Services, which the provider can challenge in district court. *Id.* § 1395oo(f)(1).

### II.

Because we write only for the benefit of the parties, we will recite the facts briefly.

Muhlenberg Hospital Center (Muhlenberg or MHC), a nonprofit, 110–bed acute care hospital in Bethlehem, Pennsylvania, sold its assets to Lehigh Valley Health Services Organization (LVHSO), pursuant to an agreement dated October 28, 1997. Muhlenberg entered this transaction after hiring a consultant from National Health Advisors to research whether the hospital should remain independent or affiliate with another entity. As a small hospital offering limited services, Muhlenberg was concerned that it would be excluded from managed care contracts and eventually forced to close, given the presence of large hospitals in other parts of the Lehigh Valley. The consultant's main goal was to determine "the best way for [Muhlenberg] to fulfill [its] obligation to the community going forward." App. 213.

Muhlenberg considered entering into a transaction with a number of nonprofit and for-profit hospitals, but chose Lehigh Valley Health Network (LVHN), LVHSO's parent organization, primarily because of LVHN's ability to improve the quality of care and access to services in the community. Pursuant to the agreement reached between LVHN and Muhlenberg, Muhlenberg sold all of its assets, including cash, to LVHSO and in return, LVHSO paid Muhlenberg costs associated with the transaction and assumed Muhlenberg's liabilities of $43,336,847. In addition, LVHN agreed to contribute up to $20,000,000 to the Muhlenberg Foundation, to develop and expand the Muhlenberg campus, and to allow five members of Muhlenberg's Board of Trustees to hold seats on the LVHN Board.

On the date of sale, Muhlenberg's net book value was $104,408,209, of which $48,748,442 consisted of cash and investments, $13,481,670 of other current assets, such as net patient accounts receivable, and $42,178,097 of other assets, including net property plant and equipment. Deloitte and Touche, hired by Muhlenberg to assist in the calculation of loss, determined that the fair market value of Muhlenberg's fixed and intangible assets was $62,640,000.

Muhlenberg claimed a loss of $30,344,944 on the sale of its assets and sought to recover excess depreciation in the amount of $4,277,421 for Medicare's share of the loss. The fiscal intermediary determined that Muhlenberg was not entitled to a loss on sale. Given that the "purchase price was significantly less than the market value of the Provider's assets," the intermediary determined that the transaction was not a *bona fide* sale. App. 1376. The Board affirmed, concluding that Muhlenberg "did not receive the fair market value as consideration for the[ ] assets transferred in the sale transaction," and the transaction was not a *bona fide* sale. App. 29. The CMS administrator declined to review the Board's decision, and it became the final agency decision. On cross motions for summary judgment, the District Court entered judgment in favor of defendant. This appeal followed.

### III.

We have jurisdiction to review the District Court's decision under 28 U.S.C. § 1291, 28 U.S.C. § 1331, and 42 U.S.C. § 1395oo(f)(1). We apply the same standard of review as the District Court, and therefore review its decision *de novo. Mercy Home Health v. Leavitt,* 436 F.3d 370, 377 (3d Cir.2006) (citing *Mercy Catholic Med. Ctr. v. Thompson,* 380 F.3d 142, 151 (3d Cir.2004); *Robert Wood Johnson Univ. Hosp. v. Thompson,* 297 F.3d 273, 280 (3d Cir.2002)). Like the District Court, we can set aside the Secretary's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action

was "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

It is well-settled that an agency's interpretation of its own regulations must be given "substantial deference," particularly in "a complex and highly technical regulatory program, such as Medicare, which requires significant expertise and entail[s] the exercise of judgment grounded in policy concerns." *Mercy Home Health*, 436 F.3d at 377 (citing *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994)) (quotation marks omitted). Although our review of agency legal interpretation is plenary, our "role in conducting such review is not to impose [our] own interpretation of the ... regulation, but instead to defer to [an agency's] position so long as it is reasonable." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1191 (3d Cir.1986) (quotation marks omitted). Indeed, we must give agency interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Mercy Home Health*, 436 F.3d at 377 (quotation marks omitted).

Furthermore, if substantial evidence supports the agency's factual determination, we must affirm that determination. *Monsour Med. Ctr.*, 806 F.2d at 1190–91. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 1190 (quotation marks omitted). In assessing the evidence, we must "consider[ ] the evidentiary record as a whole." *Id.*; 5 U.S.C. § 706(2)(E). It is well-established that if "an agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings of fact." 806 F.2d at 1191.

## IV.

Lehigh Valley Hospital–Muhlenberg, formerly known as Muhlenberg Hospital Center, challenges the District Court's decision on two grounds: first, Lehigh contends that the District Court and the Board erroneously relied on a program memorandum issued three years after the transaction; second, Lehigh argues that substantial evidence does not support the conclusion that the transaction at issue was not a *bona fide* sale.

 According to Lehigh, reliance on Program Memorandum A–00–76, issued on October 19, 2000, to analyze the transaction "constitute[d] improper retroactive rule making." Appellant Br. at 17. We disagree.

As a threshold matter, the Board's decision does not refer to the Program Memorandum, and it may not have even considered the memorandum in its decision making. Yet, as the District Court correctly noted, the Board "did not set forth the rationale for its findings in great detail." App. 14. Like the District Court, the Board may have drawn upon the Program Memorandum in arriving at its conclusion regarding the sale, but simply not included a reference to it in its decision. In any event, Lehigh's concerns are unwarranted: Even if the Board relied on the Program Memorandum, such reliance was entirely reasonable and does not raise retroactivity concerns.

Lehigh relies on the Supreme Court's decision in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988), which held retroactive rule-making invalid under the Medicare Act. Unlike the rule at issue in *Bowen*, however, the Program Memorandum merely helps explain an existing rule; it does not create a new rule. Both the title

and the first sentence make clear that the memorandum was issued to "clarify application of the regulations at 42 CFR 413.134($l$)." App. 31. The memorandum also explicitly states that "the effective date for this [Program Memorandum] is not applicable. This [Program Memorandum] does not include any new policies.... Intermediaries are to apply this clarification to all cost reports for which a final notice of program reimbursement has not been issued." App. 34. In addition, the interpretation set forth in the memorandum was consistent with agency policy in place at the time of the sale.

In the alternative, Lehigh asserts that even if the memorandum only constitutes a clarification, not new rule-making, the deference provided to the Program Memorandum "was arbitrary, capricious, an abuse of discretion and not in accordance with law." Appellant Br. at 18. Lehigh argues that administrative interpretations are not binding on this Court, noting that "[a]n interpretive bulletin does not rise to the level of regulation and does not have the effect of law.... Instead, the level of deference given to an interpretive bulletin is governed only by the bulletin's persuasiveness." *Id.* at 18 (citing *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 135 (3d Cir.1999)).

■ This argument ignores, however, that broad deference to the Secretary's interpretation is warranted, where as here, a case involves "the complex scheme of Medicare reimbursement, for the regulation and adjudication of which the Secretary has been given primary responsibility." *Monongahela Valley Hosp. v. Sullivan*, 945 F.2d 576, 593 (3d Cir.1991) (citing *Butler County Mem'l Hosp. v. Heckler*, 780 F.2d 352, 356 (3d Cir.1985)); *see also Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 282 (3d Cir.2002).

Furthermore, contrary to Lehigh's contention that the Program Memorandum applies only to mergers and consolidations, not sales, the memorandum is, in fact, instructive in this dispute. The memorandum was issued specifically to address "Special Considerations Applicable to Transactions Involving Non–Profit Organizations." App. 32. It notes that "[n]on-profit organizations differ in significant ways from for-profit organizations. Non-profit organizations typically do not have equity interests (i.e., shareholders, partners), [and] exist for reasons other than to provide goods and services for a profit." *Id.* Indeed, just as "many non-profit mergers and consolidations have only the interests of the community-at-large to drive the transaction," the record in this case reveals that in asset sales, community interests may also play a prominent role in driving the transaction. *Id.*

■ Moreover, the Program Memorandum clarifies the Secretary's views about what constitutes a *bona fide* sale in the nonprofit context. The memorandum explains that

> As with for-profit entities, in evaluating whether a *bona fide* sale has occurred in the context of a merger or consolidation between or among non-profit entities, a comparison of the sales price with the fair market value of the assets acquired is a required aspect of such analysis. As set forth in [the Provider Reimbursement Manual] 104.24, reasonable consideration is a required element of a *bona fide* sale....Non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time ... may not be taken into account in evaluating the reasonableness of the overall consideration (even where such elements may be quantified in dollar terms).

These factors are more akin to goodwill than to consideration.

App. 33. This guidance is directly relevant to the transaction at hand, and as we explain below, consistent with its previous interpretation as to the requirements for a *bona fide* sale. Accordingly, reliance on the Program Memorandum was not arbitrary or capricious, an abuse of discretion, or contrary to the law.

## V.

■ Lehigh contends that the District Court should not have granted summary judgment to the Secretary because the Board's determination that the transaction at issue did not constitute a *bona fide* sale was not supported by substantial evidence. Lehigh asserts that the sale of Muhlenberg was "in exchange for reasonable consideration, including the promises of future services to the community and the development of the MHC campus as well as the assumption of debt and funding of the hospital's foundation." Appellant Br. at 22. Lehigh argues that the Board and the District Court abused their discretion in deciding that "the only consideration to be recognized in determining whether the MHC transaction was a bona fide sale was the value of the assumed liabilities." *Id.* at 25.

As we have explained, courts must give substantial deference to the Secretary's interpretation of the Medicare Act and regulations, and where substantial evidence supports an agency decision, a court must defer to the agency's determination. *See, e.g., Monsour Med. Ctr.*, 806 F.2d at 1190. In this case, the Secretary reached the reasonable conclusion that a transaction, in which the sale price did not approach actual market value, was not a *bona fide* sale.

Department of Health and Human Services regulations and the Provider Reimbursement Manual make clear that providers can receive reimbursement only for losses on *bona fide* sales. The Provider Reimbursement Manual explains that a *bona fide* sale is "an arm's length transaction between a willing and well informed buyer and seller, neither being under coercion, for *reasonable* consideration." Supplemental App. 2 (emphasis added). The regulations define fair market value as "the price that the asset would bring by bona fide bargaining between well-informed buyers and sellers at the date of acquisition." *Id.* § 413.134(b)(2).

The record supports the Secretary's conclusion that Muhlenberg did not receive fair market value for its assets and, as a result, the transaction was not a *bona fide* sale. Pursuant to the agreement with Muhlenberg, LVHSO assumed Muhlenberg's liabilities of $43,748,442 and paid for the transaction costs of the sale. But the book value of the hospital was over $100,000,000, and Deloitte and Touche had valued the hospital's fixed and intangible assets at $62,640,000.

Testimony before the PRRB makes clear that the hospital's leadership was more concerned with maintaining quality health care in the community than obtaining the highest price. The record reveals that Muhlenberg did not pursue negotiations with several other potential purchasers whose bids might have been higher than Lehigh's. Further, the former chief financial officer of Muhlenberg admitted that even if another potential purchaser had offered a price higher than Lehigh's, he would have recommended *against* entering the transaction.

Lehigh's theory that the Board should have considered "the value of the promises to develop the campus and provide future services in the purchase price" is unpersuasive. App. 16. In support of this argument, Lehigh cites *Provider–Lac Qui*

*Parle Hospital of Madison v. Intermediary–Blue Cross and Blue Shield Ass'n,* P.R.R.B. Dec. No. 95–D37, 1995 WL 933980 (May 10, 1995), in which the Board determined that there was a *bona fide* sale, despite a very low purchase price. The Board in *Lac Qui Parle,* however, reached that conclusion because the transaction was the only viable option for the facility. *Id.* at * 11. In *Lac Qui Parle,* unlike in the instant case, there was a distinct lack of interest from neighboring providers, many of whom believed "the facility had very little value and little sustainability for alternate uses." *Id.* at *9–10.

Lehigh also relies on *Ashland Regional Medical Center v. Blue Cross and Blue Shield Association,* PRRB Dec. No. 98–D32, 1998 WL 102268 (Feb. 27, 1998), to argue that the Board's failure to consider the value of future services was an abuse of discretion. In *Ashland,* however, the provider "assumed the risk and obligation of operating a hospital for at least 5 years where losses where [sic] projected to be between $17 and $35 million dollars over this time period." *Id.* at *12. The Commonwealth of Pennsylvania "retained a right of reentry and a reversionary interest in the real and personal property of the Hospital if [the provider] failed to abide by the terms of the conveyance." *Id.* at *2. These obligations are strikingly different from the promises regarding future services at issue in this case.

Furthermore, the Program Memorandum, discussed above, makes clear that "non-monetary consideration, such as a seller's concession from a buyer that the buyer must continue to provide care for a period of time ... may not be taken into account in evaluating the reasonableness of the overall consideration." App. 33. Substantial evidence supports the Board's decision not to include the promise of future services in analyzing whether the transaction was a *bona fide* sale.

Finally, Lehigh asserts that the Board's determination that "the transaction was not a bona fide sale because the purchase price ... failed to include the skilled nursing facilities [and] assisted living facilities was arbitrary, contrary to the law and not supported by substantial evidence." Appellant Br. at 21. Lehigh contends that the skilled nursing facility and assisted living facility were not sold as part of this transaction, and no consideration needed to be accorded to them. *Id.* at 22.

As the District Court noted, the Board's determination in this regard was "a bit confusing," since the assisted living and skilled nursing facility were not, in fact, sold to LVHSO, but rather merged with LVHN, its parent company. App. 21. We agree with the District Court, however, that the Board "did not consider the potential negative book value of the other facilities sold in determining the consideration received." App. 20–21. Rather, the Board based its conclusion that the transaction between Muhlenberg and LVHSO did not constitute a *bona fide* sale on the fact that "the sale price for the assets did not equate to the cash and cash equivalents." App. 130. The District Court correctly concludes that the Board "did not find that the skilled nursing facility and assisted living facility should have been included in calculating the gain or loss on sale." App. 20. The determination regarding these facilities is reasonable and supported by substantial evidence.

## VI.

For the foregoing reasons, we will affirm the District Court's decision in all respects.